RAYMOND M. STINSON
*vs.*
FRANK C. BRIDGES, ADMR. OF
DORA C. STINSON ESTATE

Hancock.   Opinion, January 24, 1957.

*Blaisdell & Blaisdell,* for plaintiff.

*Harry E. Wilbur,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, BELIVEAU, TAPLEY, SULLIVAN, DUBORD, JJ.

SULLIVAN, J.   Plaintiff has been awarded a jury verdict in his action of assumpsit to recover from the estate of Dora C. Stinson the fair value of services which he asserts he performed for the intestate during her last four years of life. The pleading was the general issue. Defendant has addressed to the Law Court his motion for a new trial.

Defendant contends that the verdict was against the evidence and the weight of the evidence and that the damages granted were excessive.

Defendant's intestate died at the age of 86. She was not a relative of the plaintiff.

Plaintiff did not testify. There was real evidence consisting of four written exhibits and of transcribed interrogatories and answers thereto of the plaintiff's sister, admitted without objection. The oral evidence was supplied by one witness for the plaintiff and one witness for the defense.

The account annexed of the plaintiff claims the amount of $6,255 for labor performed through the period ranging from February 5, 1950 to September 8, 1954. Defendant's intestate died on May 12, 1954. The verdict was for $3,000.

The four exhibits are evidence that during the relevant span of time the defendant's intestate requested the plaintiff to send to her a meter reading, the defendant's intestate paid to the plaintiff the aggregate sum of $96 and that the defendant's intestate paid $58.37 to one Joyce inferentially for lawn mowing.

The plaintiff's single, attending witness contributed testimony which, in paraphrase and by excerpts, was as follows:

> After the death of Isaac, husband of Dora Stinson, the plaintiff performed services about her home for the three or four year period until Dora's death.

> "The only way I can answer that is by being there all through the years and almost every day going to the home myself and what I see, and I see him there almost continually during that three or four year period."

> "I have seen him to work in the garden at times, I have seen him helping on a hundred and one different small jobs. Such as taking the banking boards, putting them on in the fall and taking them off in the spring."

> "I have seen him working on the storm windows, putting them on in the fall and taking them off, and

"I can go down the line a dozen things, small things like that."

"I have seen him tend the stoves and the furnace."

"I could name a list of small things."

"Well, if they wanted an errand, going to the store, he did that a number of times. I would say anything that come up a man should do with an old lady that could not do a man's work of any kind that he was there a big part of the time during the four year period to do it."

"Never had occasion to keep any track of it except what I see day after day, I wasn't interested in it."

"I don't think there was a day or a night very often during that period but what he was there sometime through it."

Asked how long the plaintiff would stay the witness replied that he could not state exactly but that it would vary from day to day from one hour to five or six. He said that Dora Stinson was at the place all the time, that plaintiff was there only when Dora was and that the residence was larger than ordinary. The witness was a next door neighbor for twenty years and was at Dora's house almost every day. He carried the mail there almost every night and kept track of the situation. Dora was at Rockland in later years in the winter, from October or November to April or May and during such absences the home was closed. The witness paid little attention to the house during Dora Stinson's absences. Dora Stinson hired the lawn mowed. Witness saw the plaintiff at times working in Dora's gardens.

"I would say he was around every day a certain period of it as far as I know during the four years."

"I couldn't swear all them days he was working."

"As far as one neighbor knows another's affairs he was there and filling the gap."

"Between Isaac's death and her death that is what he was doing."

Plaintiff's sister in response to written interrogatories had made answers which were admitted at the trial without objection and which in tenor or quotation are as follows:

> Witness lived near the intestate for the last five years of the latter's life. Dora Stinson was the widow of an uncle of the witness and plaintiff and "a very hard person to live with, very demanding."

> "I could not live all the time with her. I was there every day and nearly every night."

From 1950 until the time of Dora Stinson's death the witness was at Dora's house every day at least once.

> "Well, kind of company for her, kind of cleaning up the house and you know, taking over like that."

The plaintiff was at Dora's house "about every day" and more than once, doing the following:

> "Everything, he painted, made door steps, he shingled, why he was always doing something, things that she wanted him to do, planting a garden, he used to hoe the garden."

Plaintiff took care of the place generally for Dora. As to the fires:

> "Yes, she had oil and he kept the thing filled up, used to go there every night and do that."

Plaintiff "did carpentry work around the place."

Raymond did all the work except the housekeeping and "then he was caretaker when they would go to Rockland in the winter."

Nobody but the plaintiff did any of the chores around Dora Stinson's place after Isaac died.

> "When she was in her bed, that was two or three days before she died, she could look out of her window and see the buildings and would say, 'Oh dear, that needs fixing, or that needs painting, but Raymond will see to that.'"

Defendant presented one witness, a near neighbor, who testified that in the falls, springs and summers from September 1952 until the death of Dora Stinson the plaintiff in the observation of the witness did no work for Mrs. Stinson save for isolated instances of his shingling of the roof, of his putting banking boards about the house and of his trimming some tall grass.

In cases such as this where claims for compensation are made after death of the alleged debtor who can no longer dispute the matter the tasks of the jury and court are not light or enviable.

The principles of law involved here have been fully and repeatedly stated throughout our reports so as to be commonplace far beyond any need of any considerable citation.

The record reveals that the parties were accorded a fair trial without prejudicial error in law. The evidence which left much to be desired in amount and quality was conflicting and sufficient, although little more, to support a verdict. The jury saw and heard the witnesses. This court did not. The case presented issues of fact which the jury decided. We cannot substitute our judgment for theirs. We are not a deferred or sublimated jury.

From the decided cases we cite at random a few of the many controlling authorities.

> "It is an elementary principle that when valuable services are rendered by one person at the request, or with the knowledge and consent of another, under circumstances not inconsistent with the relation of debtor and creditor between the parties, a promise to pay is ordinarily said to be implied by law on the part of him who knowingly receives the benefit of them, and is enforced on grounds of justice in order to compel the performance of a legal and moral duty."

*Saunders* v. *Saunders*, 90 Me. 284, 289.

"In such cases, as neither the justice of the plaintiff's claim, nor the moral obligation or duty of the defendant, is at once apparent, the law creates no contract in favor of the plaintiff, and aside from the ordinary burden of proof raises no presumption against him. It simply leaves it as a question of fact to be determined by the jury upon the peculiar circumstances and conditions existing in each case. It is then incumbent upon the plaintiff to satisfy the jury that the services were rendered under circumstances consistent with contract relations between the parties, and that the defendant either expressly agreed to pay for the services, or to give certain property therefor, or that they were rendered by the plaintiff in pursuance of a mutual understanding between the parties that he was to receive payment, or in the expectation and belief that he was to receive payment, and that the circumstances of the case and the conduct of the defendant justified such expectation and belief."

*Saunders* v. *Saunders*, 90 Me. 284, 290.

- - - - -"It is not enough to show that valuable service was rendered. It must be shown also that the plaintiff expected to receive compensation, and that the defendant's intestate so understood, by reason of a mutual understanding or otherwise, or that under the circumstances he ought so to have understood. Both propositions are essential and must be proved. This is the law of implied contracts. Whether the plaintiff expected compensation, and whether the defendant's intestate so understood, or ought so to have understood, are questions of fact, and must be determined in a case like this, where there is no testimony from either of the parties, by a consideration of the circumstances, of their relations to each other, of their conduct respectively, and of the probabilities."

*Leighton* v. *Nash*, 111 Me. 525, 528.

There is not in any given case a legal presumption that services are rendered either gratuitously or

for compensation. The issue is one of fact, whether under the circumstances of the particular case the services were rendered on the basis of contractual relation, either express or implied.

*Colvin* v. *Barrett, Admr.*, 151 Me. 344, 352.

"A verdict by a jury on a properly submitted issue should not be set aside even when there is strong doubt of the actual occurrence or existence of a fact found by a jury. If the evidence is conflicting, their finding will not be disturbed on that ground. A new trial will not be granted unless the verdict is clearly wrong. Where there is evidence to support a verdict and there is nothing in the case which would justify the substitution of the judgment of the court, who did not see nor hear witnesses, for that of the jury who did, and it appearing that the parties have had a fair trial without prejudicial error in law, the verdict should not be disturbed. See Cobb vs. Coggswell, 111 Me. 336; Sanford vs. Kimball, 106 Me. 355; Lewis vs. Railroad Co., 97 Me. 340; Stone vs. Street Railway, 99 Me. 243; Atkinson vs. Orneville, 96 Me. 311. The burden is on the moving party to show that the adverse verdict is clearly and manifestly wrong. Day vs. Isaacson, 124 Me. 407. See also Perry vs. Butler, 142 Me. 154 and Jannell vs. Myers, 124 Me. 229."

- - - - -"The evidence in this case was such that intelligent and fairminded persons might differ thereon."

*Bowie* v. *Landry*, 150 Me. 239, 241, 242.

- - - - -"The issue is not whether we agree with the verdict, but whether the decision of the jury was clearly wrong. We find nothing to indicate that the jury reached the verdict through bias, prejudice, or mistake of law or fact. First Nat'l. Bank v. Morong et al., 146 Me. 430, 82A (2nd) 98 (1951)."

*Birmingham* v. *Sears, Roebuck & Co.*, 151 Me. 460.

The sound, legal principles arrayed above and a considered review of the evidence in the instant case decide us that the jury was not manifestly or clearly wrong in its conclusion that an implied contractual relation and a legal obligation obtained between the plaintiff and the defendant's intestate.

Upon the topic of damages analysis demonstrates that from February 5, 1950 to May 12, 1954 were some 1557 days. The amount of the verdict is $3,000. Allowance may be made for payment to the plaintiff of the aggregate sum of $96 in accordance with two exhibits introduced by the defense. It becomes manifest, then, that, for the whole period of stated time to the death of the intestate, the jury awarded the plaintiff less than $2 per day or $14 per 7 day week for services rendered. If the jury found that the plaintiff worked only one half of the days involved, the payment is $4 per day or $28 per 7 day week. We cannot from the record know the actual calculation by the jury.

It is our judgment that the evidence was sufficient to sustain a verdict for the plaintiff. With that established we cannot say that a verdict for the amount set was excessive to the extent that it becomes "apparent that the jury acted under some bias, prejudice or improper influence, or have made some mistake of fact or law." *Pearson* v. *Hanna,* 145 Me. 379, 381; *Cayford* v. *Wilbur,* 86 Me. 414, 416.

*Motion overruled.*